**HERITAGE RESOURCES, INC., Appellant,**

v.

**NATIONSBANK, Co–Trustee under the will of David B. Trammel, Deceased, et al., Appellees.**

No. 08–94–00062–CV.

Court of Appeals of Texas, El Paso.

March 9, 1995.

Rehearing Overruled April 12, 1995.

John R. Woodward, Woodward & Shaw, Dallas, for appellant.

Robert Scogin, Kermit, Ben A. Douglas, Rick K. Disney, Douglas, Kressler & Weuster, P.C., Ft. Worth, for appellees.

Before BARAJAS, C.J., and KOEHLER and LARSEN, JJ.

## OPINION

LARSEN, Justice.

This case involves construction of royalty clauses in several oil and gas leases in Winkler County. We affirm.

## FACTS

Nationsbank is trustee for several owners of undivided fractional interests in gas, oil, and other minerals inherited under the will of David B. Trammel and leased to Heritage Resources, Inc. Heritage operates the wells and owns an undivided fractional interest in each of them. In January 1989, bank personnel noticed that Heritage was making a severance/handling deduction from royalty payments under the leases. The severance deduction was for taxes, and the bank had no quarrel with that. The handling deduction, however, was for transportation after production. To that the bank objected, asking for reimbursement for all handling charges, as the lease language specifically prohibited deduction for any costs of marketing the gas. The language at issue reads:

> [T]here shall be no deductions from the value of Lessor's royalty by reason of any required processing, cost of dehydration, compression, transportation, or other matter to market such gas.

Heritage refused to reimburse the royalty owners for amounts it had deducted for post-production transportation from the wellhead. The bank brought suit against Heritage to recover the amounts of "handling expenses" which Heritage had deducted from royalty payments since 1985. The trial court entered partial summary judgment in favor of Nationsbank, holding that the relevant. lease language prohibited deduction of transportation costs from the royalties. After a bench trial, the trial court entered judgment awarding Nationsbank, as co-trustee, and the royalty owners, $271,444.29 for transportation deductions made between September 1985 and April 1993, plus interest and attorneys fees.

Heritage brings seven points of error. It urges that the trial court erred as a matter of law in interpreting the royalty clause to prohibit deduction of transportation costs; that there is legally or factually insufficient evidence that Heritage deducted any transportation costs from the royalties; and that Heritage should not be liable for the total amounts of transportation costs because division orders on certain wells specifically authorized deduction of transportation costs from royalties and were binding upon the royalty owners until revoked.

## INTERPRETING THE ROYALTY CLAUSE

In its Points of Error One through Three, Heritage claims that the trial court erred by misinterpreting the royalty clause of the leases; in concluding that deduction of the transportation costs was a breach of contract for which plaintiffs were entitled to damages in the amount equal to the deductions; and by concluding that Heritage had violated statutory mandates making it liable for the transportation costs, without regard to whether it had breached its contract. As these points are closely related, we address them together.

The clauses at issue vary only slightly from lease to lease. They read:

3. The royalties to be paid Lessor are . . .

(b) on gas, including casinghead gas or other gaseous substances produced from the land, or land consolidated therewith, and sold or used off the premises or in the manufacture of gasoline or other products therefrom, *the market value at the well of ⅛ of the gas so sold or used,* provided that on gas sold at the well the royalty shall be ⅛ of the amount realized from such sale provided, however, that *there shall be no deductions from the value of Lessor's royalty* by reason of any required processing, cost of dehydration, compression, *transportation or other matter to market such gas.*

Or:

3. In consideration of the premises, Lessee covenants and agrees . . .

(b) To pay the Lessor ¼ *of the market value at the well for all gas* (including all substances contained in such gas) produced from the leased premises and sold by Lessee or used off the leased premises; provided, however, that *there shall be no deductions from the value of Lessor's royalty* by reason of any required processing, cost of dehy-

dration, compression, *transportation, or other matter to market such gas.*

Or:

3. Lessee shall pay the following royalties subject to the following provisions: ...

(b) Lessee shall pay the Lessor ¼ *of the market value at the well for all gas* (including all substances contained in such gas) produced from the leased premises and sold by Lessee or used off the leased premises, including sulphur produced in conjunction therewith; provided, however, that *there shall be no deductions from the value of Lessor's royalty* by reason of any required processing, cost of dehydration, compression, *transportation, or other matter to market such gas.* [All emphasis added].

■ First, Heritage argues that the lease language "there shall be no deductions from the value of Lessor's royalty by reason of any required processing, cost of dehydration, compression, transportation or other matter to market such gas" cannot mean that Heritage must pay royalties based upon the market value at the wellhead; if this were so, it claims, the amount of royalty would depend entirely upon the point of sale and would have no relation at all to the market value of the gas at the well, thus rendering the portion of the royalty clause calling for payment of a fraction of market value *at the well* meaningless.

Heritage's theory is based upon two premises: that "the value of Lessor's royalty" is directly tied to market value at the well; and that "market value at the well" must necessarily take into consideration transportation costs, as the amount a buyer is willing to pay for gas at the wellhead is inextricably tied to the amount the buyer must pay to transport the gas to its ultimate use site, or to the site at which it will be resold. Thus, Heritage argues, the lease guarantee that lessor's royalty will not be reduced means only that Heritage cannot deduct more in post-production costs than the *reasonable* cost of transporting the gas to its market and the cost of other processing necessary to market it. As these costs are inherently part of determining market value at the well, Heritage was

entitled to deduct the handling charges as it did. We disagree for the following reasons.

■ A royalty is the landowner's share of gas production, free of production expenses. Although not subject to costs of production, royalty interests are usually subject to costs incurred *after* production, such as production or gathering taxes, costs of treating the gas to render it marketable, and costs of transportation to market, where the royalty interest is payable (as here) "at the well." 3 H. Williams, **Oil & Gas Law,** § 645.2 at 598 (1993). Nevertheless, this general rule is subject to modification by the parties. *Martin v. Glass,* 571 F.Supp. 1406, 1410 (N.D.Tex.1983), *aff'd,* 736 F.2d 1524 (5th Cir. 1984); see also *Robert v. Swanson,* 222 S.W.2d 707, 711 (Tex.Civ.App.—Eastland 1949, writ ref'd n.r.e.). The dispute in this case arises from lease language giving the royalty as a fraction of "market value at the well," the means by which royalty interests are usually measured, while providing that there shall be no deduction from the royalty interest for post-production costs, costs for which royalty owners are usually liable.

■ We construe a gas lease under the general rules governing the construction of contracts. The intent of the parties is controlling and where the terms of the lease are unambiguous, the parties' objective intent is determined by the language of the lease itself without resort to parol evidence. *Hutchings v. Chevron U.S.A., Inc.,* 862 S.W.2d 752, 757 (Tex.App.—El Paso 1993, writ denied). We determine the controlling intent not from what the parties may have intended, but failed to express, but from the intention actually expressed in the lease as written. *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981); *Southwest Airlines Co. v. Jaeger,* 867 S.W.2d 824, 829 (Tex.App.—El Paso 1993, no writ). In determining the intent of the parties, we examine the entire instrument, making every attempt to harmonize and give effect to all provisions of the contract so that none is rendered meaningless. *Hutchings,* 862 S.W.2d at 756.

Here, to adopt Heritage's interpretation of the post-production clause would render it meaningless, as the generally understood definition of royalty payments would then

apply and any qualification would be unnecessary. The bank's (and trial court's) interpretation, on the other hand, allows all provisions to be harmonized, giving meaning to each. This is so because gas royalty payments are usually subject to post-production costs; if the royalty provisions at issue here did not contain the language excluding post-production costs, there would be no issue because the accepted definition of royalty interest, as set out above, would control. The parties here elected to specifically exempt royalties from post-production costs, however, and they must have intended *something* by this language. The lease shows that the parties contemplated gas sales away from the wellhead, and that the royalty owners would not absorb post-production costs. We conclude that the trial court was correct in deciding that the parties intended the gas royalty payments to be free from costs of "any required processing, cost of dehydration, compression, transportation or other matter to market such gas." Thus, Heritage breached its contract by deducting transportation costs from the royalties. Heritage's Points of Error One and Two are overruled.

■ Heritage's third point of error asserts that the trial court erred in finding it was statutorily liable for the transportation costs deducted from the royalties. TEX.NAT.RES. CODE ANN. §§ 91.401–91.406 address the liability of a payor for proceeds from the sale of natural gas. These statutes give a royalty owner a cause of action against a payor for withholding payments beyond time limits prescribed by the statutes. A payor includes an operator who has assumed responsibility for paying royalty owners their share of purchase proceeds. TEX.NAT.RES.CODE ANN. § 91.401(2) (Vernon 1993). We conclude that the trial court was justified in finding that Heritage was statutorily liable for the deducted transportation costs, as well as under a breach of contract theory. Heritage's Point of Error Three is likewise overruled.

### EVIDENCE THAT HERITAGE DEDUCTED TRANSPORTATION COSTS

■ Heritage's Points of Error Four and Five urge that legally and factually insufficient evidence supports the trial court's con-

clusion that transportation costs were deducted from these royalties.

Heritage's sufficiency of the evidence challenges are not directed to any specific findings of fact. Because they generally challenge the findings that Heritage deducted transportation costs, we discern that the following findings are at issue:

6. The total amount of transportation costs for gas attributable to Plaintiffs' royalty interests produced from all leases for the period of September of 1985 through April of 1993 (the 'period in suit') and deducted by Defendant is $271,444.29, which is not disputed by Defendant. Defendant's own calculation is depicted on the document in evidence as Plaintiffs' Exhibit 1, and it correctly reflects the total amounts deducted by Defendant for costs of transportation.

. . . . .

9. The amounts deducted by Defendant from Plaintiffs' royalties for transportation costs during the period in suit were paid to Urantia Corporation, a Texas corporation. . . .

. . . . .

11. Defendant has made no payments to Plaintiffs of the amounts deducted from their royalties as transportation costs for the period in suit.

We believe there is evidence of probative force to support these findings of fact. At the hearing on Defendant's Motion for Abatement and Motion to Set Aside Earlier Partial Summary Judgment, Heritage's own witness, Mr. Gary Todd, gave the following testimony, which was incorporated into the November 4 trial:

Q: And Heritage undertook to pay the royalty to the Plaintiffs, did it not?

A: Yes. It took on that obligation.

Q: Has anyone else ever paid any royalty to any of the Plaintiffs?

A: Not to the best of my knowledge.

Q: Who deducted the transportation costs?

A: Heritage was responsible for the generation of the checks and the calculations involved in that.

. . . . .

Q: If you had not deducted any transportation charges, the NCNB would have received these amounts as additional royalties. Is that correct?

A: Yes.

Testimony at the November 4 trial also supports the trial court's findings:

Q: And was it apparent from the detail sheets how the deductions were made from the royalty payments to the Plaintiffs? Transportation charges, excuse me.

A: Originally, yes.

Q: And they were designated as handling charges?

A: The combination of severance and handling charges was a deduction.

Q: You know what the severance tax is?

A: Yes.

Q: And the balance of it would be the handling charges?

A: Yes.

Q: And .the handling charges later developed to be the transportation charges?

A: Yes.

Q: When we are talking about handling charges, we are talking about the same thing as transportation deductions?

A: Yes.

We conclude that legally and factually sufficient evidence supported the findings that Heritage deducted transportation costs from the royalties. Points of Error Four and Five are overruled.

### LIABILITY AFTER DIVISION ORDERS

■ Heritage's Points of Error Six and Seven urge that the trial court failed to take into account certain division orders which allowed it, as operator, to deduct transportation costs, and which superseded the leases upon which the royalty owners rely. The division orders governing payment for the leases were from the date of first production on each well until they were revoked by service of citation in this lawsuit in September 1989. The division orders contain the following language:

All proceeds from the sale of gas shall be paid to the undersigned or their assigns in the proportions as herein set out less taxes and any costs incurred in the handling and *transportation* to the point of sale, treating, compressing boosting, dehydrating, or any other conditioning necessary, subject to the terms of any contract of purchase and sale which affects the above described property ... [Emphasis added].

 Division orders are contracts of sale for oil or gas; they direct the purchaser to make payment for the value of the oil or gas in proportions set out in the order. **Williams & Meyers, Manual of Oil & Gas Terms** 299 (9th Ed.1994). Although division orders do not rewrite or supplant lease agreements, payments made to and accepted by royalty owners under division order terms are effective to meet the royalty requirements under a lease until the orders are revoked. See *Exxon Corp. v. Middleton,* 613 S.W.2d 240, 250 (Tex.1981). Division orders are not binding on royalty owners, however, where an operator benefits from error in the orders and is thereby unjustly enriched. *Gavenda v. Strata Energy, Inc.,* 705 S.W.2d 690, 692 (Tex.1986).

Heritage claims it gained no benefit from the division orders allowing deduction of transportation cost, and that therefore the orders were binding upon the royalty owners until they were revoked. Thus, Heritage urges it is not liable for deducting transportation costs as authorized by the division orders. We disagree for two reasons.

First, we note that Heritage's evidence on this subject was far from definitive; several of the division orders have strikeouts over the language at issue. All the division orders contain a disclaimer which states:

[D]espite anything stated herein to the contrary, the execution of this instrument is not intended to alter or amend the Lease or any amendment thereto pertaining covering our [the royalty owners'] interest or interests shown on this instrument.

Thus, there is evidence within the division orders themselves that the parties intended

to continue relying upon the leases, with its understanding that transportation costs would not be deducted from royalties, nor would royalty owners have their legal remedies curtailed.

Second, the trial court found that Heritage arranged for transportation from the wellhead to the pipeline carrier, Urantia Corporation, contracted for the price payable to that carrier, and deducted those amounts from royalties. Michael Wisenbaker, president and sole shareholder of Heritage is also the majority owner of Urantia. Thus, there is evidence that Heritage profited from the error in division orders. The trial court could properly conclude, therefore, that the royalty owners were not bound by the division orders and that Heritage was liable for reimbursement to the royalty owners for transportation costs improperly withheld in payment to Urantia.

Finally, Heritage relies upon language in the division orders which precludes legal action against the operator, reading:

> In the event the undersigned is not paid to the full amount for his division of interest of the proceeds derived from the sale of gas and condensate, the undersigned shall have *no legal action against Operator* but, instead, the undersigned shall have as its sole legal remedy against those division of interest owners who were paid in excess of the amount such an interest owner should have received from the proceeds of the sale of such gas and condensate. [Emphasis added].

Because we have found that Heritage benefitted from the erroneous division orders, thus rendering them non-binding upon the royalty owners, we also conclude that the provision limiting or precluding a cause of action against Heritage was ineffective. Heritage's Points of Error Six and Seven are overruled.

### CONCLUSION

We affirm the trial court's judgment.

KOEHLER, J., not participating.