**In re ACG COTTON MARKETING, L.L.C., Relator.**

**No. 07–98–0409–CV.**

Court of Appeals of Texas, Amarillo.

Jan. 25, 1999.

Craig, Terrill & Hale, L.L.P., Eric G. Walraven, H. Grady Terrill, Lubbock, for appellant.

Martin, Drought & Torres, Inc., Edward C. Snyder, McAllen, for appellee.

Before QUINN and REAVIS and JOHNSON, JJ.

BRIAN QUINN, Justice.

Pending before the court is the petition for mandamus sought by ACG Cotton Marketing, L.L.C. (ACG). Through the petition, ACG seeks a writ of mandamus directing the Honorable William Shaver, Assigned Judge of the 72nd Judicial District Court, to compel Mezclillas y Gabardinas S.A. de CV (M & G) to submit to arbitration. The dispute, allegedly susceptible to arbitration, concerns the sale of cotton by ACG to M & G. For the reasons which follow, we deny the petition for writ.

### Background

According to the record before us, both ACG and M & G signed a document labeled "Sale No. 5040" (Contract No. 5040). Therein, ACG "confirm[ed] having sold to" M & G approximately 2,000 bales of "raw cotton" of

a specific grade, micronaire, and strength. The "terms" of the sale were also specified. Furthermore, under the category denominated "Rules," the parties listed "Texas Cotton Association." A copy of those rules appears in the record. Perusal of the rules reveals that they are divided into four sections. Section I covers "Local Rules," Section II, "General Rules," Section III, "Primary Marketing Rules," and Section IV, "Arbitration and Appeals."

The execution of Contract No. 5040 was one of two transactions between ACG and M & G mentioned in the record. The second concerned the sale of approximately 1,500 bales and carried the label "Sale No. 5020." Contract No. 5020, much like Contract No. 5040, described the quantity, grade, staple, micronaire, and strength of the commodity sought by M & G. However, it differed in several details. The distinction pertinent here involved reference to the rules under which the agreement was executed. Instead of merely stating "Rules: Texas Cotton Association" as in Contract No. 5040, Contract No. 5020 stated "Rules & Arbitration: Texas Cotton Association."

Eventually, it came time to perform both contracts and ACG began shipping cotton to M & G. The latter accepted the initial shipments. However, subsequent deliveries were refused because the cotton allegedly contained excessive sand. Thereafter, ACG allegedly sold the remainder of the cotton to other buyers, and a dispute arose as to whether M & G was entitled to the return of its deposit. According to ACG, the parties agreed to resolve the matter via arbitration. Consequently, it asked the Honorable William Shaver to compel M & G to arbitrate. The trial court granted the request via written order entered October 27, 1998, as it related to disputes arising from Contract No. 5020, but denied it as to claims involving Contract No. 5040. ACG subsequently petitioned this court to issue mandamus compelling Judge Shaver to order M & G to arbitrate Contract No. 5040.

### Discussion

▮▮▮▮ Whether a trial court erred in failing to compel arbitration is a topic which can be reviewed by petition for mandamus. *Freis v. Canales,* 877 S.W.2d 283, 284 (Tex. 1994); *United Parcel Serv., Inc. v. McFall,* 940 S.W.2d 716, 718 (Tex.App.—Amarillo 1997, orig. proceeding). Once such a petition is filed, it becomes our duty to determine whether the trial court abused its discretion in denying the order sought. *Solis v. Evins,* 951 S.W.2d 44, 48 (Tex.App.—Corpus Christi 1997, orig. proceeding); *Belmont Constr., Inc. v. Lyondell Petrochemical Co.,* 896 S.W.2d 352, 356 (Tex.App.—Houston [1st Dist.] 1995, no writ). To do this, we must first decide whether the parties entered into a written agreement to arbitrate. *Id.; see* 9 U.S.C.S. § 2 (Law. Co-op 1997) (requiring a written agreement); Act of May 24, 1995, 74th Leg., R.S., Ch. 588, § 1, 1995 Tex. Gen. Laws 3402 (amended 1997) (current version at TEX. CIV. PRAC. & REM.CODE ANN. § 171.001 (Vernon Supp.1999) (requiring a written agreement). This is so, because arbitration is a matter of contract, and one cannot be forced to arbitrate unless he agreed to do so. *Freis v. Canales,* 877 S.W.2d at 284; *United Parcel Serv., Inc. v. McFall,* 940 S.W.2d at 718. Furthermore, although the agreement need not appear in any particular form, it must nevertheless be sufficient to clearly or unambiguously evince the intention of the parties to arbitrate their disputes. *Porter & Clements,. L.L.P. v. Stone,* 935 S.W.2d 217, 220 (Tex.App.—Houston [1st Dist.] 1997, orig. proceeding); *Wetzel v. Sullivan, King, & Sabom, P.C.,* 745 S.W.2d 78, 81 (Tex. App.—Houston [1st Dist.] 1988, no writ); *Manes v. Dallas Baptist College,* 638 S.W.2d 143, 145 (Tex.App.—Dallas 1982, writ ref'd n.r.e.). If no such intent exists, the court cannot utilize public policy to manufacture an agreement and thereby deprive a litigant of its right to judicial resolution of the dispute.[1]

---

1. We are aware of that line of authority cited by ACG stating that public policy 1) favors arbitration and 2) creates a presumption that the parties agreed to arbitrate. *See, e.g., Cantella & Co. v. Goodwin,* 924 S.W.2d 943, 944 (Tex.1996). Yet, those cases would apply only when the wording of a contract raised a legitimate question as to whether the parties agreed to arbitrate. If nothing in the contract can reasonably be read to require arbitration, then notions of public policy cannot be used to rewrite the agreement. *Belmont Constr., Inc. v. Lyondell Petrochemical Co.,*

*Belmont Constr., Inc. v. Lyondell Petrochemical Co.*, 896 S.W.2d at 356–57 (noting that the "policy of resolving doubts in favor of arbitration cannot serve to stretch a contractual clause beyond the scope intended . . . or allow the modification of the plain and unambiguous provisions of an agreement").

■ ACG argued that Contract No. 5040 constitutes such a written agreement. Although the requisite acquiescence did not expressly appear on the face of the document, it nevertheless existed via the incorporation of the Texas Cotton Association (Association) rules into the contract.[2] Furthermore, Section IV, Rule 3 of those rules purportedly mandated that, under the circumstances before us, M & G arbitrate. Assuming, *arguendo*, that the simple phrase "Rules: Texas Cotton Association" constituted an agreement to incorporate the Association's rules into the contract, as ACG proposed, we find nothing in Section IV, Rule 3 evincing an intent to bind M & G to arbitration.

The particular rule stated:

(a) An Arbitration Committee may properly consider a case involving a dispute between or among any of the following:

(1) Active members of this Association;

(2) Members of this Association and non-members by consent of both parties or by court order enforcing a previously existing arbitration agreement. In the absence of a court order a case between a member and a nonmember may not be properly considered by an Arbitration Committee without the written consent of both parties. *If the contract in dispute between a member and nonmember provides for arbitration pursuant to these Arbitration Rules, the parties to the contract shall be deemed to have consented to arbitration under these Arbitration Rules.*

(emphasis added).[3] As can be seen, the rule dealt with two topics. The first concerned the particular disputes which the Arbitration Committee had authority to entertain; that is, it could hear complaints between members of the Association and between members and nonmembers who consent to or are ordered to arbitrate.

The second topic (which appears in the portion of the rule which we italicized) was nothing more than an example of when it could be said that a nonmember gave consent. And, in affording those italicized words their plain meaning, *see Heritage Resources, Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996) (stating that when construing a contract, its words are generally afforded their plain, ordinary, and generally accepted meaning), we construe them as stating that a nonmember is deemed to have consented if the contract from which the dispute arose provided for arbitration under the rules. In other words, Rule 3 of Section IV alone did not mandate arbitration. Rather, it required that the nonmember either be ordered to arbitrate or consent to arbitration in writing. Furthermore, the need for consent was satisfied (in at least one instance) when the parties stated in the contract itself that they would arbitrate pursuant to the Association's rules.

Deeming a nonmember to have consented is conditioned upon the contract expressly providing that arbitration will occur pursuant to the rules. Here, however, the contract did not so expressly provide, as it did *vis-a-vis* No. 5020.[4] At best, by simply incorporating

---

896 S.W.2d 352, 356–57 (Tex.App.—Houston [1st Dist.] 1995, no writ); *see Dempsey v. King,* 662 S.W.2d 725, 728 (Tex.App.—Austin 1983, writ dism'd) (stating that courts lack the authority to supply terms of a contract which the parties failed to agree upon or otherwise omitted).

**2.** There is authority for the proposition that incorporating into a contract a set of industry rules dealing with a myriad of topics, including one which demands arbitration, may be enough to bind the parties to arbitrate. *See, e.g., Western Vegetable Oils Co. v. Southern Cotton Oil Co.,* 141

F.2d 235, 236–37 (9th Cir.1944) and cases cited therein.

**3.** It is undisputed that M & G is not a member of the Texas Cotton Association.

**4.** Again, in Contract No. 5020 the parties expressly mentioned the word "arbitration" when it purported to incorporate the Texas Cotton Association rules into the agreement. In doing so, the parties not only included in the contract words manifesting their intent to arbitrate pursuant to the Association's rules, but also deemed themselves to have consented to arbitrate as con-

the Texas Cotton Association Rules into the contract, M & G and ACG merely agreed to deem themselves as having consented to arbitrate under the rules *if* somewhere the contract provided that they would arbitrate under the rules. Having failed to include such a separate, express manifestation of their intent to arbitrate, neither party bound itself to arbitrate.

In sum, Contract No. 5040 is not reasonably susceptible to contradictory interpretations. Nothing therein clearly evinced the parties' intention to bind themselves to arbitration. Nor can the parties' mere adoption of rules, which require independent consent to arbitrate, be reasonably read to *ipso facto* require arbitration. Thus, we are unable to say that M & G agreed to arbitrate or that the trial court abused its discretion in refusing to compel the parties to arbitrate.

The petition for writ of mandamus is denied.

templated in Section IV, Rule 3. In other words, they expressly "provided for arbitration pursuant to the[ ] . . . Rules" and thereby "deemed" themselves to have consented to arbitrate.