Becker v. State



COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS



)


PHELPS DODGE REFINING )
 

CORPORATION,
)
 No. 08-02-00179-CV

)


 Appellant,
)
 Appeal from

)
 

v.
)
 34th District Court

)


SAMUEL LUERA and )
 of El Paso County, Texas

DANNY MEDINA,
)


 )
 (TC# 2000-400)

 Appellees.
)



MEMORANDUM OPINION



 Phelps Dodge Refining Corporation appeals a judgment awarding damages to Samuel Luera
and Ysidro Danny Medina in their action against Phelps Dodge for breach of an employment
contract. We reverse and render a take-nothing judgment in favor of Phelps Dodge.

FACTUAL SUMMARY


 Samuel Luera and Danny Medina began working at Phelps Dodge in 1979. Both men
worked in the Electrolytic Department or the "Tank House" as it is more commonly known. There
are several jobs in the Tank House with pay grades ranging from a low of Grade I for a laborer to
Grade VIII for a handyman carpenter or machine operator. This is referred to as the "line of
progression." Depending on the production needs on a given day, the employees in the Tank House
could be assigned to any job for which they qualified. Thus, their rate of pay varied depending on
the job to which they were assigned. Within two years of employment, Luera and Medina qualified
for most of the positions in the Tank House, including Hotsheetman.

 On July 1, 1983, the United Steelworkers called a strike at Phelps Dodge. Three weeks after
the strike began, Phelps Dodge sent a letter to all employees stating that they could return to work
at the same wages being paid before the strike began. The letter provided that employees who
crossed the picket line and returned to work would be given the opportunity to train for the highest
jobs on the line of progression in the Tank House: Craneman, Pumpman, Commercial Meterman,
and Hotsheetman. (1) Further, qualifications earned during the strike would not be taken away at the
end of the strike nor would an employee be "bumped" out of a job for which he had qualified in
order to train a senior employee. Both Luera and Medina, who had been laid off for more than a
year, crossed the picket line and returned to work in the Tank House. As promised in the letter,
Luera and Medina were permitted to train for the Commercial Meterman position.

 In 1985, Phelps Dodge created a new position, the Efficiency Man, which combined the work
previously performed by the Meterman and the Hotsheetman. Technological changes made possible
the creation of this new position. With the creation of the Efficiency Man classification, Phelps
Dodge was able to do the same work with fewer people resulting in significant savings to the
company. Luera, Medina, and three other people who had crossed the picket line were the first five
employees permitted to train and qualify for the Efficiency Man position.

 At some point during the strike, the employees at Phelps Dodge voted that the United
Steelworkers would no longer represent them and they made an unconditional offer to return to
work. The union contacted Phelps Dodge and requested that the striking employees be rehired. 
Phelps Dodge, in accordance with federal labor law, established a preferential hiring list for the
striking employees. As vacancies occurred, they reinstated the employees based on seniority.

 Many of the returning employees qualified for the Efficiency Man position and had greater
seniority than Luera and Medina. Consequently, Phelps Dodge adopted a Standard Operating
Procedure (SOP) which gave what is known as "red circle" status to Luera, Medina, and the other
three employees who had crossed the picket line. An employee with "red circle" status could not
be "bumped" by an employee with greater seniority to a lower pay grade on the line of progression. 
The SOP specifically provided that a Tank House employee who was qualified as a Hotsheetman
and a Commercial Meterman was qualified for the Efficiency Man job classification. Further, the
SOP stated that Luera, Medina, and the other three employees "who [had] been performing the work
of Efficiency Man [would] have seniority rights to hold the job over any employee who train[ed]
and/or qualifie[d] on or after November 1, 1985." It is undisputed that Phelps Dodge consistently
applied the SOP to Luera, Medina, and the other three employees for the next fourteen years. Even
when the five employees were assigned to lower paying jobs on the line of progression, their pay rate
remained at that of a Grade VII Efficiency Man. In effect, the SOP provided them with a "safety
net."

 Policy changes made by Phelps Dodge eventually diminished the protection provided by the
SOP. In the early 1990's, Phelps Dodge implemented a program designed to encourage Tank House
employees to develop self-managed work teams. Luera and Medina worked together on a team
known as "the Rebels." Prior to 1996, all Tank House employees were paid on an hourly basis, and
with the exception of the five "red circle" employees, the jobs to which they were assigned and their
pay rate was determined on the basis of seniority. In this system, seniority was also used to
determine which employees would be laid off during a reduction in force. In 1996, Phelps Dodge
initiated a major policy change which eliminated the impact and advantage of seniority rights. The
company informed all employees that they would be required to convert from hourly status to non-exempt salaried teams. Although making the conversion eliminated seniority rights, the salaried
employees had a significant advantage in that the hourly teams would be the first persons laid off
during a reduction in force.

 Faced with theses choices, every team except the Rebels converted from hourly status to non-exempt salaried status. The conversion to non-exempt salaried status had to be a unanimous decision
by all members of the team. Luera and Medina wanted to convert but some of the other thirteen
members of their team did not. They also attempted to change teams but no other teams would
accept them. Medina believed this resistance may have been due to resentment over his decision to
cross the picket line and jealousy of his "red circle" status. As some evidence that Medina's
concerns may not have been well-founded, all of the salaried teams contained a mixture of former
strikers, crossovers, and new hires. Further, the other three employees who had been enjoying "red
circle" status were on teams which had made the decision to convert to non-exempt salaried status.

 In September of 1999, Phelps Dodge underwent a major reduction in force which resulted
in the lay-off of 200 employees, including Luera, Medina, and all of the other hourly employees. 
Following this reduction in force, fourteen employees performed the job of Efficiency Man. Of
those fourteen, twelve had trained for the position after November 1, 1985 and were members of
salaried teams.

 On February 4, 2000, Luera and Medina filed suit alleging that Phelps Dodge had breached
an employment contract. They asserted that the SOP granting them "red circle" status constituted
an employment contract. Phelps Dodge denied the existence of an employment contract. At trial,
the jury "Yes" to the following question:

 Did Phelps Dodge Refining Corporation ('Phelps Dodge'), Samuel Luera and Ysidro
Danny Medina agree on November 1, 1985 that Samuel Luera and Ysidro Danny
Medina would have seniority rights to hold the job of efficiency man over any
employee who trains and/or qualifies on or after November 1, 1985?


The jury further found that Phelps Dodge breached that agreement and awarded damages to both
Luera and Medina for loss of past and future earning capacity and benefits. (2) After denying Phelps
Dodge's motion for judgment notwithstanding the verdict, the trial court entered judgment in favor
of Luera for a total of $158,053 and in favor of Medina for a total of $230,636, plus prejudgment
interest and attorney's fees.

JURY'S FINDING OF EMPLOYMENT CONTRACT


 In its first issue on appeal, Phelps Dodge argues that the agreement found by the jury does
not alter the at-will status of Luera and Medina, and therefore, the jury's findings were immaterial
and should have been disregarded by the trial court. A jury's findings on special issues may be
disregarded only if they are immaterial or if they have no support in the evidence. Eubanks v. Winn,
420 S.W.2d 698 (Tex. 1967); Garza v. Alviar, 395 S.W.2d 821 (Tex. 1965).

Standard of Review


 Although the parties disagree as to the interpretation of the agreement, neither party raised
the issue of ambiguity in the trial court. Therefore, the trial court had a duty to construe the
agreement by applying well established rules of construction. The contract must be examined as a
whole in light of the circumstances present when the contract was entered. National Union Fire
Insurance Co. of Pittsburgh, PA v. CBI Industries, Inc., 907 S.W.2d 517, 520 (Tex. 1995). Each part
of the contract is considered against all other parts to determine its meaning, and there is a
presumption that the parties intended every part to have some effect. Heritage Resources, Inc. v.
NationsBank, 939 S.W.2d 118, 121 (Tex. 1996). Terms used in the contract have their "plain,
ordinary, and generally accepted meaning unless the [contract] shows that the parties used them in
a technical or different sense." Id. Unambiguous contracts are enforced as written. Id. In reviewing
the trial court's construction of an unambiguous contract, we apply a de novo standard. Accordingly,
we are not required to defer to any interpretation afforded by the trial court. MCI
Telecommunications Corp. v. Texas Utilities Elec. Co., 995 S.W.2d 647, 650 (Tex. 1999).

At-Will Employment


 In construing the contract, we keep in mind certain principles of employment law. In Texas,
employment is presumed to be at-will. Midland Judicial District Community Supervision and
Corrections Department v. Jones, 92 S.W.3d 486 (Tex. 2002); Montgomery County Hospital District
v. Brown, 965 S.W.2d 501, 502 (Tex. 1998). Subject to one narrow exception, employment for an
indefinite period may be terminated at-will by either party and without cause. Brown, 965 S.W.2d
at 502; Schroeder v. Texas Iron Works, Inc., 813 S.W.2d 483, 489 (Tex. 1991). Valid contractual
limitations on the right to terminate may be imposed by agreement of the parties. Day &
Zimmermann, Inc. v. Hatridge, 831 S.W.2d 65, 68 (Tex.App.--Texarkana 1992, writ denied). To
establish a cause of action for wrongful discharge, an employee must prove that he and his employer
entered into a contract that specifically provided that the employer did not have the right to terminate
the employment at will. Day & Zimmermann, 831 S.W.2d at 68; Webber v. M.W. Kellogg Co., 720
S.W.2d 124, 127 (Tex.App.--Houston [14th Dist.] 1986, writ ref'd n.r.e.). Such a contract must be
written if it is not performable within one year from the date of making. See Day & Zimmermann,
831 S.W.2d at 68 (discussing application of statute of frauds to employment contracts). However,
the mere fact that an employment contract is in writing does not rebut the presumption of
employment at-will. Smith v. SCI Management Corporation, 29 S.W.3d 264, 266-67 (Tex.App.--Houston [14th Dist.] 2000, no pet.).

 To avoid the employment-at-will doctrine, an employee has the burden of proving he and the
employer had a contract that directly limited in a "meaningful and special way" the employer's right
to terminate the employee. See Massey v. Houston Baptist Univ., 902 S.W.2d 81, 83
(Tex.App.--Houston [1st Dist.] 1995, writ denied). In the contract, the employer "must
unequivocally indicate a definite intent to be bound not to terminate the employee except under
clearly specified circumstances." See Brown, 965 S.W.2d at 502; Saucedo v. Rheem Mfg. Co., 974
S.W.2d 117, 128 (Tex.App.--San Antonio 1998, pet. denied)(op. on reh'g). Such an intent is not
manifested by general comments or statements that an employee will not be terminated as long as
his work is satisfactory or that he will be discharged only for "good reason" or "good cause" unless
there is an agreement between the employer and employee on what those terms encompass. See
Brown, 965 S.W.2d at 502. In order to be enforceable, an agreement to modify the employment
at-will relationship must be (1) expressed rather than implied and (2) clear and specific. Byars v.
City of Austin, 910 S.W.2d 520, 523 (Tex.App.--Austin 1995, writ denied); Miksch v. Exxon Corp.,
979 S.W.2d 700, 703 (Tex.App.--Houston [14th Dist.] 1998, pet. denied); see Brown, 965 S.W.2d
at 503 (agreement to modify at-will employment must be clear and specific).

 At-will employees may contract with their employers on any matter except those which
would limit the ability of either employer or employee to terminate the employment at will. Light
v. Centel Cellular Company of Texas, 883 S.W.2d 642, 644 (Tex. 1994). Consideration for a
promise, by either the employee or the employer in an at-will employment, cannot be dependent on 
a period of continued employment. Id. Any promise made by either employer or employee that
depends on an additional period of employment is illusory because it is conditioned upon something
that is exclusively within the control of the promisor. Id. at 644 n.5. Such a promise would be
illusory because it fails to bind the promisor who always retains the option of discontinuing
employment in lieu of performance. Id. at 645.

Employment for a Specific Term


 The jury found that the employees and Phelps Dodge agreed on November 1, 1985 that Luera
and Medina would have seniority rights to hold the position of Efficiency Man over any employee
who trained or qualified for the position on or after that date. Luera and Medina argue that the SOP
established a specific term of employment, namely, as long as Phelps Dodge employed individuals
as Efficiency Men who had trained after November 1, 1985. Therefore, Phelps Dodge could only
terminate them for good cause. Contrary to their view, the agreement does not establish a specific
term or period of service but rather is indefinite. When a term of service is left to the discretion of
either party, or the term is left indefinite, or terminable by either party, either may end the
employment at will without cause. Curtis v. Ziff Energy Group, Ltd., 12 S.W.3d 114, 117
(Tex.App.--Houston [14th Dist.] 1999, no pet.); Hussong v. Schwan's Sales Enter., Inc., 896 S.W.2d
320, 324 (Tex.App.--Houston [1st Dist.] 1995, no writ).

Termination of Employment Limited to Certain Circumstances


 The next issue is whether the agreement found by the jury clearly and specifically evidenced
an intention on the part of Phelps Dodge to terminate employment except under limited
circumstances. In their brief, Luera and Medina address only the "employment for a specific term"
issue and do not specifically address this issue. However, they generally argue that Phelps Dodge
intended to provide them with continued employment in consideration for their contributions to
establishing the Efficiency Man position. To this end, Phelps Dodge agreed not to terminate their
employment so long as the company employed individuals as Efficiency Men who had trained after
November 1, 1985. The employees do not contend that Phelps Dodge agreed to never terminate
them because, with the passage of time, there will always be employees who trained and/or qualified
for the Efficiency Man position after November 1, 1985. Instead, they claim that the agreement
provides them with limited protection against a lay-off because it requires Phelps Dodge to first lay
off those employees who trained and/or qualified for the Efficiency Man position after November 1,
1985.

 While the SOP articulated Phelps Dodge's decision to provide the five employees with "red
circle" status and it arguably provided them with limited protection in the event of a lay-off, it did
not unequivocally limit Phelps Dodge's right to discharge Luera or Medina under circumstances
other than a lay-off. Stated differently, the granting of "seniority rights" to Luera and Medina does
not preclude Phelps Dodge from terminating them for good cause, no cause, or even bad cause. 
Consequently, the agreement did not modify their at-will status. Because the employment
relationship remained at-will and Phelps Dodge could terminate either employee at any time, the
promise contained in the agreement is illusory and unenforceable. Luera and Medina cannot recover
for breach of an employment contract. Issue One is sustained. The judgment of the trial court is
reversed and a take-nothing judgment is rendered in favor of Phelps Dodge.


March 20, 2003 

 ANN CRAWFORD McCLURE, Justice


Before Panel No. 2

Barajas, C.J., McClure, and Chew, JJ.
1. The electrolytic process carried out in the Tank House removes impurities from copper anodes. A copper
anode weighing approximately 750 pounds is placed in an electrolytic bath of copper sulfate and sulfuric acid at 150-155
degrees. Over a period of twenty-eight days, noble metals or impurities fall to the bottom of the bath as a sludge or slime
and the more active metal, such as nickel and antimony, go into the electrolyte. A sheet of pure copper, or cathode,
weighing approximately fourteen pounds is placed in the electrolytic bath and the pure copper is plated onto the cathode. 
The process yields two 300-pound cathodes. If the anode and cathode come into contact, a short circuit results and the
copper will not plate onto the cathode. Prior to the strike, the Commercial Meterman was responsible for metering the
cathodes and detecting any short circuits while the Hotsheetman corrected any short circuits. The Efficiency Man, which
is a position created after the strike, performed both jobs. 
2. The jury awarded Luera: $16,100 for loss of past earning capacity; $70,000 for loss of future earning
capacity; $9,000 for loss of past benefits; and $25,000 for loss of future benefits. The jury awarded Medina: $23,290
for loss of past earning capacity; $119,000 for loss of future earning capacity; $9,000 for loss of past benefits; and
$25,000 for loss of future benefits.