**Opinion issued February 13, 2014**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00677-CV

————————————

**MICHELIN NORTH AMERICA, INC., Appellant**

**V.**

**FIRST INDUSTRIAL NLF 12 JV, LLC, Appellee**

---

**On Appeal from the 295th District Court**
**Harris County, Texas**
**Trial Court Case No. 2009-16011**

---

## MEMORANDUM OPINION

This appeal arises from a declaratory judgment action to construe a commercial lease and a counterclaim for breach of that lease. A jury returned a verdict in favor of appellant, Michelin North America, Inc. Appellee, First Industrial FR NLF 12, LLC, moved for judgment notwithstanding the verdict. The

trial court granted the motion and awarded First Industrial damages for breach of contract.

On appeal, Michelin argues that the court erred by entering JNOV. Michelin claims that either it was the party entitled to judgment as a matter of law or, alternatively, interpretation of the contract was a fact question, and there was sufficient evidence to support the jury's verdict. We affirm the judgment.

**Background**

Michelin keeps some of its famous tires in a large Harris County warehouse. It used to own this warehouse, but it sold the building in January 2006 to First Industrial as part of a deal in which it would lease the premises. The parties heavily negotiated the agreement and deployed lawyers at the bargaining table. The lease ultimately included a paragraph on insurance which provided that First Industrial would hold a policy insuring the building but would bill Michelin for the policy's costs.

In September 2008, Hurricane Ike damaged the warehouse. During the preceding years, First Industrial had neglected to bill Michelin for the cost of insuring the warehouse. Now that the building was in need of repair, however, First Industrial invoiced Michelin $232,210.04 for insurance premiums covering February 2006 to the end of 2008. The parties disputed this figure but finally reached a compromise. Then, First National demanded payment for $1,327,642,

2

corresponding to expenses incurred to satisfy the deductible on the warehouse policy.

Michelin filed suit seeking a declaratory judgment that, since First Industrial had failed to give advance notice of the amount of the policy's deductible, Michelin did not owe the $1.3 million sought. It contended that section 9.2 of the lease obliged First National to inform it of the size of the deductible at the beginning of each "Lease Year," which corresponded to the calendar year. The section reads:

> 9.2   Landlord shall maintain: (a) a commercial property insurance policy covering the Premises (at its full replacement cost), but excluding Tenant's and TPL's personal property; (b) commercial general public liability insurance covering Landlord for claims arising out of liability for bodily injury, death, personal injury, advertising injury and property damage occurring in and about the Premises and otherwise resulting from any acts and operations of Landlord, its agents and employees; (c) rent loss insurance; and (d) any other insurance coverage deemed appropriate by Landlord or required by Landlord's lender. All of the coverages described in (a) through (d) shall be determined from time to time by Landlord, in its reasonable discretion. All insurance maintained by Landlord shall be in addition to and not in lieu of the insurance required to be maintained by the Tenant. *Tenant shall pay to Landlord* all market-based premiums for commercial property, casualty, boiler, flood, earthquake, terrorism and all other types of insurance (other than general public liability insurance) provided by Landlord and relating to the Premises, all reasonable administrative costs incurred in connection with the procurement and implementation of such insurance policies and *all commercially reasonable deductibles paid by Landlord pursuant to insurance policies required to be maintained by Landlord under this Lease (collectively, "Insurance Costs"). Landlord shall notify Tenant of the amount of such Insurance Costs for each Lease Year and Tenant shall pay, on the first day of each month during that Lease*

3

*Year, an amount equal to such amount divided by 12 (or the fractional portion of the Lease Year remaining at the time Landlord delivers its notice of the amounts due from Tenant for that Lease Year); or at Landlord's election, Landlord may instead bill Tenant annually for such insurance charges and Tenant shall pay all such charges to Landlord, as Additional Rent, within thirty (30) days after Landlord's delivery of written demand therefor.* Notwithstanding the preceding provisions of this grammatical paragraph concerning insurance to be procured and maintained by Landlord, Tenant shall have the right, at any time during the term and upon sixty (60) days' advance written notice to Landlord, to elect to itself procure and maintain the property insurance described in (a) above (the "Tenant's Insurance Election"). Tenant may not exercise Tenant's Insurance Election in the event of a breach or default by Tenant hereunder that remains uncured at the time Tenant desires to exercise Tenant's insurance Election. If Tenant exercises Tenant's Insurance Election, then Tenant shall be solely responsible for the timely payment of all insurance premiums imposed with respect to such property insurance, and all of the applicable provisions of Section 9.1 shall apply with respect to such property insurance coverage.

(Emphasis supplied.)

First Industrial counterclaimed for breach of contract. Both parties moved for summary judgment. Both motions were denied by the then-presiding judge, who decided that ambiguities in the lease required a trial.

A different judge oversaw the subsequent jury trial. Michelin took the position that it had negotiated language in Section 9.2—"Landlord shall notify Tenant of the amount of such Insurance Costs . . . "—so that it could know the amount of the deductible on the policy First Industrial had purchased and intelligently decide whether to exercise its "Tenant's Insurance Election" to procure its own coverage. As Michelin protested, its concern had been merely to

4

obtain insurance with the best combination of deductible and cost. During negotiations, it was amenable to permitting First Industrial to be the party that carried insurance on the warehouse so long as the landlord could obtain a better value. Otherwise, it wanted to secure its own insurance contract. So when First Industrial presented a $1.3 million bill, Michelin claimed to have been blindsided, both because it had been led by First National's representations to believe that deductible costs would be much lower and because it had no prior warning during the years in which the lease was in effect that First Industrial's policy included a deductible of that magnitude.

Michelin offered evidence of the course of negotiations and other extrinsic proof. In the end, the jury returned a verdict in favor of Michelin. It decided that the parties' agreement required First National to give notice of policy deductibles for each "Lease Year" regardless of whether deductibles had been paid due to a claimed loss.

First Industrial responded to the jury's findings with a motion for judgment notwithstanding the verdict. It made two separate arguments. First, it contended that the lease unambiguously did not require notice of a deductible unless such a deductible was actually paid; therefore, it was entitled to judgment as a matter of law. In the alternative, it argued that the evidence was insufficient to support the

5

jury's findings. The trial court entered a JNOV but did not explain the grounds of its decision. Michelin has since brought this appeal.

**Analysis**

As the trial court did not explain the basis of its ruling, Michelin's brief addresses both the sufficiency of the evidence and the correct legal interpretation of the contract. Michelin also contends that if the contract is indeed unequivocal, then it favors Michelin. We conclude that the text of the lease unmistakably supports First Industrial's interpretation, and thus we need not address the sufficiency of the evidence.

This appeal arises from a grant of JNOV. *See* TEX. R. CIV. P. 301. There are two valid reasons for judgment as a matter of law after a jury verdict. *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994); *Fazio v. Cypress/GR Hous. I, L.P.*, 403 S.W.3d 390, 394 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). The first is that the jury's findings are actually immaterial to resolution of the controversy before the court. *Spencer*, 876 S.W.2d at 157. For example, if a trial court decides that a written contract is unambiguous, then it should give the contract its plain meaning as a matter of law; this circumstance leaves the jury's findings of fact as to the parties' true intent irrelevant to the outcome of the case. When a motion for JNOV is thus granted based on a legal principle, it is reviewed de novo. *JSC Neftegas–Impex v. Citibank, N.A.*, 365 S.W.3d 387, 396 (Tex.

6

App.—Houston [1st Dist.] 2011, no pet.). The second reason JNOV may be appropriate is that the evidence is insufficient to support the jury's verdict. *Spencer*, 876 S.W.2d at 157. A JNOV granted on those grounds is reviewed for "no evidence," or for "legal sufficiency." *See Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003) (per curiam).

If a written contract has a definite legal meaning, then a court should read the text and construe it as a matter of law without help from a jury. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). When the words on the page suffice, a court should not look outside the document to decide what the parties agreed. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). The overriding objective is to "ascertain and give effect to the parties' intentions as expressed in the document." *Frost Bank*, 165 S.W.3d at 311–12.

However, if a contract is ambiguous, the court should accept parol evidence and can empanel a jury to decide, as an issue of fact, the "true intent of the parties." *Coker*, 650 S.W.2d at 394–95. A contract is ambiguous if it is open to more than one reasonable reading. *Frost Bank*, 165 S.W.3d at 312. Deciding whether a contract is ambiguous is itself an issue of law for the court. *Webster*, 128 S.W.3d at 229.

To determine whether a contract is ambiguous, courts apply standard rules of interpretation. *Frost Bank*, 166 S.W.3d at 312. These rules require an attempt to harmonize the contract as a whole. *Id.* An ideal harmonization will not treat any clause as a nullity, and courts generally presume that every provision was intended to have some effect. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). Words should be given their ordinary meaning unless it appears from context that they were used in a technical or different sense. *Id.* Courts should interpret contracts from a utilitarian perspective, keeping in mind the parties' business objectives. *Frost Bank*, 165 S.W.3d at 312. Absurd, inequitable, or oppressive interpretations are to be eschewed unless they prove unavoidable. *Id.*

The lease did not include any express language requiring First Industrial to notify Michelin of the size of the deductibles on the policy it carried for the warehouse. Paragraph 9.2 provided two alternative methods by which the landlord could bill the tenant for "Insurance Costs." Under one method, the landlord could notify the tenant of the amount of Insurance Costs for the Lease Year, and the tenant would be obligated to pay the Insurance Costs in twelve monthly payments over the course of that Lease Year. First Industrial did not exercise this option. Instead, as permitted by the lease, it elected to "bill Tenant annually" for the Insurance Costs.

The lease defines "Insurance Costs" to include "all market based premiums . . . and all commercially reasonable deductibles paid by Landlord pursuant to insurance policies required to be maintained by landlord under this Lease." Because Michelin disputes the inclusion of deductibles as part of the "Insurance Costs" that it owes, the critical word for purposes of this dispute is "paid." If the prior year did not feature a claimed loss, then there would be no deductible to pay and the Insurance Costs would include only the amount of the premiums plus reasonable administrative costs. In sum, Paragraph 9.2 explains how First Industrial would invoice Michelin for all the costs related to insuring the property in Michelin's stead. The "Insurance Costs" include any actual payments that First Industrial made to satisfy a deductible.

Michelin contends that a plausible reading of Paragraph 9.2 requires the landlord to inform the tenant of the amount of the deductible on the policy regardless of whether there has been a claimed loss. In other words, it asserts that Paragraph 9.2 was both a notice provision and a billing provision. It presents two arguments in support of its interpretation.

It first argues that it makes no sense to limit reporting to cases in which deductibles are "paid," because deductibles are never "paid." A deductible, Michelin observes, is merely an amount deducted from compensation provided by an insurer. While Michelin is correct about the way deductibles shift costs under

9

insurance policies, we do not agree that the idea of "paying" a deductible is nonsense. A deductible is "the portion of the loss to be borne by the insured before the insurer becomes liable for payment." BLACK'S LAW DICTIONARY 422 (9th ed. 2009). If a policy holder chooses to repair or replace insured property, then it will have to pay the amount of the deductible, "the amount of the loss specified in such a clause." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 301 (10th ed. 1993). This is what is commonly meant by "paying a deductible," and it is a usage of speech encountered in Texas case law. *E.g.*, *Fireman's Fund Cnty. Mut. Ins. Co. v. Hidi*, 13 S.W.3d 767, 768 (Tex. 2000) (per curiam) ("[T]he claim was subject to a deductible paid by the insured . . . ."); *Phillips Petroleum Co. v. St. Paul Fire & Marine Ins. Co.*, 113 S.W.3d 37, 42 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (reciting from an insurance company notice, "This change adds deductibles to be paid by you."); *Jackson v. Gutierrez*, 77 S.W.3d 898, 904 n.4 (Tex. App.—Houston [14th Dist.] 2002, no pet.) ("Because appellee's insurance paid for the repairs, the parties' dispute actually concerns only the $250 deductible appellee paid as a result of the accident."). Considering the foregoing, there is nothing anomalous about including "deductibles paid" as an "Insurance Cost."

Michelin's second argument is that interpreting the lease to require advance reporting of the amount of the policy deductible is necessary to avoid making the provision for the Tenant's Insurance Election irrelevant. Michelin contends that it

10

could not make an informed decision as to whether it should purchase its own coverage if it did not know the quality of coverage that First Industrial was obtaining. But Michelin does not explain why it could not simply inquire about the terms of the policy if it wished to investigate its options in this regard. It did not have to wait for a yearly report to make such inquiries. Michelin could also make use of the election after a loss brought an unhappily high deductible charge from First Industrial. For both these reasons, our reading of the contract does not lead us to agree that advance reporting of the deductible must be implied to make the Tenant's Insurance Election a meaningful right.

The lease unambiguously does not require First Industrial to give Michelin advance notice of the amount of the policy's deductible. *See R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 519 (Tex. 1980) ("If a written instrument is so worded that a court may properly give it a certain or definite legal meaning or interpretation, it is not ambiguous."). As the contract is unambiguous, our determination of its meaning is a legal conclusion. *See Frost Bank*, 165 S.W.3d at 312. The trial court correctly disregarded the jury's findings and entered judgment in favor of First Industrial.

## Conclusion

We affirm the judgment of the trial court.

Michael Massengale
Justice

Panel consists of Justices Keyes, Higley, and Massengale.

Justice Keyes concurring in the judgment only