**TEPCO, L.L.C., Kiawah Resources, L.L.C., Meritage Energy, L.L.C., and Ralph S. O'Connor, Appellants**

v.

**REEF EXPLORATION, L.P., RCWI, L.P., Reef Global Energy V, L.P., Reef Global Energy VI, L.P., Reef Global Energy VII, L.P., EP Energy E & P Company, L.P., and Anchor International of Texas, L.P., Appellees**

NO. 14–14–00370–CV

Court of Appeals of Texas, Houston (14th Dist.).

Opinion filed January 28, 2016

---

Dick Watt, Houston, TX, Carlton D. Wilde, Jr., Houston, TX, for Appellants.

Frederick R. Zlotucha, San Antonio, TX, James A. Porter, Houston, TX, S. Pilar Grantham, Houston, TX, Beth Watkins, San Antonio, TX, Neil D. Kelly, Houston, TX, for Appellees.

Panel consists of Chief Justice Frost and Justices Boyce and McCally.

## OPINION

Kem Thompson Frost, Chief Justice

Four parties to a joint operating agreement sued the operator and others seeking to recover sums they claim were owed from the production of an oil and gas well. The plaintiffs allege that the well was completed by means of a "subsequent operation," in which they elected not to participate. According to the plaintiffs, charges for the use of the wellbore should not be included in calculating the cost recoupment to which the participating parties are entitled before the plaintiffs are entitled to any proceeds of the production from the well. After a bench trial, the trial court rejected this argument, concluded that these charges should be included in the calculation, and rendered judgment that the plaintiffs take nothing by their claims. Based on the defendants' counterclaims for declaratory relief, the trial court made various declarations in its judgment and awarded the defendants attorney's fees under the Declaratory Judgments Act.

On appeal, the plaintiffs argue that the trial court erred in including the wellbore charges in the calculation under the joint operating agreement and in awarding attorney's fees. We find merit in the latter argument, but not in the former. Accordingly, we modify the trial court's judgment to delete all attorney's fee awards, and affirm the judgment as modified.

### I. FACTUAL AND PROCEDURAL BACKGROUND

In 1993, appellant/plaintiff Ralph S. O'Connor and others signed the Greens Lake Prospect Operating Agreement, covering various oil and gas leases in Galveston County (the "Shallow JOA").[1] A num-

---

1. Many of the statements in this section of the opinion are taken from findings of fact by the

ber of successful wells were drilled in the Treasure Isle Field under the Shallow JOA from relatively shallow depths. By 2006, some, but not all, of the owners of interests in the Shallow JOA wanted to drill a well in an area covered by the Shallow JOA to test deeper formations in a zone below 14,600 feet (the "Well").

To drill the Well, in 2006, these parties executed the Troon Prospect Operating Agreement (the "Deep JOA"). The Deep JOA covered lands that were subject to the Shallow JOA, but only below a specified depth. The Deep JOA provides that (1) as to the lower depths covered by the Deep JOA, the Deep JOA replaces the Shallow JOA while the Deep JOA is in effect; and (2) nothing in that agreement replaces or supersedes the Shallow JOA as to the shallower depths in lands covered by the Deep JOA (hereinafter "Article XV. V.").[2]

To reach the deeper formations, the wellbore for the Well had to be drilled through lands above 14,600 feet that are subject to the Shallow JOA. Appel-lants/plaintiffs TEPCO, L.L.C., Kiawah Resources, L.L.C., Meritage Energy, L.L.C., and Ralph S. O'Connor (hereinafter collectively the "TEPCO Parties") collectively owned 60% of the working interest in the Shallow JOA and approximately 12.3% of the working interest in the Deep JOA. When plans were made for the Well, the parties to both the Shallow JOA and the Deep JOA anticipated that the Well's wellbore later might be taken over for a completion above 14,600 feet in the Big Gas Sand, a sand that often proved productive in other areas of the Treasure Isle Field.

The Deep JOA provided that parties who later participated in an attempt to complete a well at depths above 14,600 feet using the Well's wellbore were required to reimburse the owners of the rights below 14,600 feet who participated in drilling the Well for a proportionate share of the drilling costs of the Well (each proportionate share hereinafter referred to as a "Wellbore Charge").[3]

trial court that have not been challenged on appeal.

2. Article XV.V. of the Deep JOA, entitled "Existing Operating Agreement," reads in its entirety as follows:

This Operating Agreement shall supersede and replace [the Shallow JOA] only as to the depths in the lands covered by this Operating Agreement and only for such time as this Operating Agreement remains in force and effect. Upon termination of this Operating Agreement as provided herein, the [Shallow JOA] shall become effective between the parties that are subject thereto as to the depths in the lands covered by this Operating Agreement. Nothing contained in this Operating Agreement shall serve to replace or supersede the [Shallow JOA] as to shallower depths in lands covered by this Operating Agreement or as to lands not covered by this Operating Agreement. The terms and provisions of this Operating Agreement do not and shall not be interpreted to be a release by any party from any claim which such party may have under the [Shallow JOA] prior to the effective date of this Operating Agreement; provided, however, the conduct of the parties as to the depths in the lands covered by this Operating Agreement during the term of this Operating Agreement shall be governed by this Operating Agreement.

3. Article XV.J. of the Deep JOA, entitled "Plug Back or Recompletion Procedures," reads in its entirety as follows:

Notwithstanding anything to the contrary contained herein and specifically Article VI. B., any party who participated in the drilling of a well to the objective depth shall have the right to participate in the completion attempt of any zone in such well regardless if [sic] such party had heretofore elected to go non-consent in the completion attempt of another zone. It is further understood and agreed if less than all of the parties elect to attempt any such completion, the provisions of Article VI.B.2 hereof

In September 2006, while the Well was being drilled, appellee/defendant EP Energy E & P Company, L.P. ("EP Energy"), the operator under the Deep JOA, notified the other working-interest owners that there were "gas shows" (indications of hydrocarbons) above 14,600 feet in the interval known as the Big Gas Sand and inquired if the owners wanted to log the formations in the event they later attempted a shallow completion in the same wellbore. EP Energy performed the shallow logging, to which the TEPCO Parties consented.

As drilled in the deeper formations, the Well was a dry hole. Although the estimated cost to drill the Well was approximately $10,900,000, the total cost ended up being more than $20,500,000. EP Energy, on December 19, 2006, circulated to the deep working-interest owners an election to either secure the well for future operations or make a deep completion. In light of the shallow gas shows, the TEPCO Parties and the other Deep JOA working-interest owners elected to secure the Well's wellbore for future operations. The bottom part of the wellbore was abandoned, and to facilitate its use for a completion (that is, a perforation of the wellbore in an attempt to achieve production of hydrocarbons) above 14,600 feet, a cement retainer and plugs were set at the base of the casing, a cast-iron bridge plug was set, and 100 feet of cement was spotted above the bridge plug.

The next day, December 20, 2006, all deep working-interest owners agreed to leave the oil-based drilling mud in the well, and bill that to appellee/defendant Reef Exploration, L.P. ("Reef"), the operator under the Shallow JOA, as part of the cost of turning over operations. Also on that date, EP Energy requested and Reef, as Shallow JOA Operator, agreed that Reef would pay for the oil-based mud as a cost of a shallow completion.

To take over and use the Well's wellbore for a completion attempt above 14,600 feet,

shall apply separately to each separate completion or recompletion attempt undertaken hereunder, and an election to become a non–consenting party as to one completion or recompletion attempt shall not prevent a party from becoming a consenting party in subsequent completion or recompletion attempts regardless of whether the consenting parties as to the earlier completions or recompletions have recouped their costs pursuant to Article VI.B.2; provided further, that any recoupment of costs by a consenting party shall be made solely from the production attributable to the Zone in which the completion attempt is made. Election by a previous non–consenting party to participate in a subsequent completion or recompletion attempt shall require such party to pay its proportionate share of the cost of salvageable materials and equipment installed in the well pursuant to the previous completion or recompletion attempt, insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a completion attempt.

In addition, if a party, regardless of whether such party is a signatory of this Operating Agreement, shall participate in a completion attempt in depths above 14,600', then such party shall be required to pay its proportionate share of said completion costs and *shall reimburse the owners of the rights below 14,600' who participated in drilling the well for a proportionate share of said drilling costs.* Parties who participate in drilling to depths below 14,600' shall not be required to reimburse for their proportionate share of drilling costs in the shallow horizons except as to any working interest ownership rights in said shallow horizons (above 14,600') that are higher than said party's ownership and working interest in the well drilled deeper than 14,600'. Such financial reimbursements shall be on a per footage basis and shall be depreciated in accordance with the provision in the COPAS.
(emphasis added).

the parties who participated in such an operation were responsible for the Wellbore Charges. The last sentence of Article XV.J. of the Deep JOA requires the Wellbore Charges to be calculated on a per-foot basis. Based on that formula, on February 22, 2007, Reef estimated that the total of the Wellbore Charges to take over so much of the wellbore as was needed for a completion in the Big Gas Sand would be more than $12,400,000. Wellbore Charges based on the Article XV.J. formula were not economically feasible; it would have cost less to drill a new wellbore. Therefore, Reef negotiated with EP Energy to reduce the amount of the Wellbore Charges. Negotiations with EP Energy were ongoing when, on February 28, 2007, Reef submitted to the other owners of working interests in the Shallow JOA—the TEPCO Parties, Mesuda, Limited, and Devon Energy Production Company, L.P.—a formal proposal for the completion of the Well at a depth above 12,350 feet (hereinafter the "Completion"). The proposal included a letter, the proposed completion procedure, an authority for expenditure ("AFE"), and an AFE Breakdown of Costs.[4]

In its proposal, Reef reported that EP Energy was "seeking a $6,000,000.00 reimbursement fee to take over the wellbore, which would be paid by each party's proportionate working interest in the shallow depths accordingly," although Reef said it was trying to negotiate an even lower takeover amount based on EP Energy's plugging and abandonment liability. The following week, on March 5, 2007, Reef asked EP Energy to reduce the total of all Wellbore Charges to an amount below $6 million, but was told that the matter had been taken all the way to the president of the company, and if $6 million were not the

basis for the reimbursement, the Well would be plugged and abandoned so that the Shallow JOA working-interest owners would have to drill their own well. Reef reported EP Energy's position to the Shallow JOA working-interest owners. The same day, Reef confirmed that EP Energy would accept $3,610,059.66 as its Wellbore Charge, calculated based on EP Energy's proportionate share of $6 million, proposed as the total amount of all Wellbore Charges.

Although the parties had not agreed to an amendment of Article XV.J., in light of EP Energy's ownership of approximately 60% of the working interest in the Deep JOA, the parties proceeded on the presumption that $6 million would be the agreed-upon total of all the Wellbore Charges. The TEPCO Parties acknowledge that, if they had participated in the Completion, they would have had to pay the Wellbore Charges.

Having negotiated with EP Energy a $3.6 million Wellbore Charge based on EP Energy's proportionate share of $6 million instead of the per-foot formula specified in the Deep JOA, Reef proposed to amend Article XV.J. to replace the per-foot formula for calculating Wellbore Charges under Article XV.J. with an agreed-upon amount of $6 million as the total amount of the Wellbore Charges. As events transpired, some, but not all of the parties to the Deep JOA, signed the proposed amendment. But, in the end, all parties entitled to receive a Wellbore Charge accepted payment on the basis of the $6 million total amount.

The TEPCO Parties elected not to participate in the proposed Completion, and the three TEPCO Parties owning working interests in the Deep JOA accepted pay-

4. As discussed in the analysis section below, the TEPCO Parties assert that the proposed

Completion was a "subsequent operation" under Article VI.B. of the Shallow JOA.

ments of their respective Wellbore Charges based on the $6 million total amount. The TEPCO Parties allege that, because they elected not to participate in the Completion, they were deemed to have relinquished their interests in the Well, as provided in Article VI.B.2. of the Shallow JOA.

Because the TEPCO Parties owned a total of 60% of the working interest in the Shallow JOA, their election not to participate in the Completion meant that the participants in the Completion had to pay the TEPCO Parties' 60% share of the costs of the Completion, including the Wellbore Charges, or the Completion could not go forward. Reef made arrangements with appellee Anchor International of Texas, L.P. to satisfy the Wellbore Charge to Anchor by receiving part of the interest in the Well relinquished by the TEPCO Parties when they elected not to participate in the Completion. The Wellbore Charge to EP Energy was satisfied partly by a cash payment and partly by receiving a portion of the interest in the Well the TEPCO Parties relinquished when they elected not to participate in the Completion.

The Completion was successful. The Well, completed in June 2007, produced gas in significant quantities for a while, though the level of production later declined. A dispute arose as to whether the TEPCO Parties were entitled to any of the proceeds of the production from the Well.

### The TEPCO Parties' Claims

The TEPCO Parties filed suit against appellees/defendants Reef Exploration, L.P., RCWI, L.P., Reef Global Energy V, L.P., Reef Global Energy VI, L.P., Reef Global Energy VII, L.P., EP Energy E & P Company, L.P., and Anchor International of Texas, L.P. (hereinafter collectively the "Reef Parties"), asserting claims for breach of the Shallow JOA, conversion, unjust enrichment/money had and received, and quantum meruit. The TEPCO Parties asserted that (1) the proposal for the Completion was a proposal for a subsequent operation under Article VI.B. of the Shallow JOA; (2) under this provision, because the TEPCO Parties elected not to participate in the Completion, they were "Non–Consenting Parties," who relinquished to the Consenting Parties all of their interests in the Well and share of production therefrom until the cost-recoupment formula in Article VI.B.2. (the "Formula") was satisfied, at which point (hereinafter the "Payout Point"), the TEPCO Parties' relinquished interests automatically would revert to them; (3) the Completion did not involve any drilling, and under the Shallow JOA, the Wellbore Charges should not be included in the Formula; and (4) if the Wellbore Charges are not included in the Formula, then the Payout Point has been reached and the TEPCO Parties should have been paid revenues from production under the Shallow JOA after the Payout Point. The TEPCO Parties asserted that (1) the Payout Point was reached in June 2008 and (2) based on their interests in the production from the Well, they were entitled to receive $7.669 million after the Payout Point, yet they did not receive any of the proceeds of production.

### The Reef Parties' Counterclaims

The Reef Parties asserted that the 600% cost-recoupment factor should be applied to the Wellbore Charges in calculating the Payout Point under the Formula. According to the Reef Parties, under the correct calculation, the Payout Point has not been reached. The Reef Parties counterclaimed for declaratory relief.

### The Trial Court's Judgment

After a bench trial, the trial court rendered judgment in favor of the Reef Par-

ties, ordering that the TEPCO Parties take nothing by their claims, making various declarations, and awarding the Reef Parties attorney's fees under the Declaratory Judgments Act. The trial court issued findings of fact and conclusions of law, concluding that Reef's application of the 600% cost-recoupment factor to the Wellbore Charges in calculating the Payout Point under the Formula did not amount to a breach of the Shallow JOA and that the TEPCO Parties' construction of the Formula is inconsistent with the plain language of the Shallow JOA. The trial court determined that the Payout Point had not been reached.

The trial court also made the following conclusions of law:

- The Shallow JOA and Article XV.J. of the Deep JOA ("Article XV.J.") together state the parties' agreement on how the costs of a completion in the shallow horizons of the Well would be allocated and charged.

- Those costs would include the drilling costs of the wellbore in the shallow horizons. Article XV.J. permits the incorporation of a portion of the Well into the contract area covered by the Shallow JOA for the purpose of a shallow completion attempt.

- That incorporation is accomplished by means of the Wellbore Charges, which are a drilling cost reimbursement. Article XV.J. expressly deems these reimbursed drilling costs to be drilling costs in the shallow horizons.

- Article XV.V. of the Deep JOA does not prohibit the application of the 600% cost-recoupment factor to reimbursed drilling costs because Article XV.J. does not replace or supersede any provision of the Shallow JOA.

- Rather, Article XV.J. facilitates the incorporation of the Well's wellbore into the Shallow JOA contract area through a reimbursement mechanism.

- The reimbursed drilling costs remain drilling costs in calculating the Payout Point under the Formula in the Shallow JOA.

- The Wellbore Charges were a drilling cost subject to the 600% cost-recoupment factor under the Formula.

- The TEPCO Parties may not recover against certain of the Reef Parties because of a lack of privity of contract.

- The applicable statute of limitations bars the TEPCO Parties' claims for breach of the Shallow JOA, conversion, and unjust enrichment/money had and received.

On appeal, the TEPCO Parties raise five issues challenging the trial court's judgment.

## II. ISSUES AND ANALYSIS

**A. Did the trial court err in concluding that the 600% cost-recoupment factor should be applied to the Wellbore Charges in calculating the Payout Point?**

■ In their first appellate issue, the TEPCO Parties assert the trial court erred in construing the unambiguous language of the agreements by concluding that (1) the $6 million in Wellbore Charges under Article XV.J. were "incorporated" as a "reimbursement mechanism" to be included in the provisions of the Shallow JOA and (2) the Wellbore Charges were "drilling costs" to which the 600% cost-recoupment factor properly could be applied in calculating the Payout Point, even though the Completion did not involve any

drilling. The main question raised under the TEPCO Parties' first issue is whether, under the unambiguous language of the Shallow JOA and Deep JOA, the 600% cost-recoupment factor should be applied to the $6 million in Wellbore Charges in calculating the Payout Point for the purposes of determining the merits of the TEPCO Parties' claims.[5] To resolve the issue, we must construe various provisions of the Shallow JOA and the Deep JOA.

In construing contracts, our primary concern is to ascertain and give effect to the intentions of the parties as expressed in the contract. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex.1998). We cannot rewrite the contract or add to its language under the guise of interpretation. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex.2003). To ascertain the parties' true intentions, we examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex.1999). Whether a contract is ambiguous is a question of law for the court. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996). A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Id.* But, when the wording of a written contract can be given a definite legal meaning or interpretation, the court will conclude it is unambiguous, and construe it as a matter of law. *American Mfrs. Mut. Ins. Co.*, 124 S.W.3d at 157.

We begin the contract analysis by noting our agreement with the trial court's conclusion that the contract provisions at issue are unambiguous.[6] *See Heritage Res., Inc. v. NationsBank*, 939 S.W.2d at 121.

### Contract Analysis

Article VI.B. of the Shallow JOA is entitled "Subsequent Operations," and subsection 1 of this article is entitled "Proposed Operations." In the first sentence of this subsection, the parties agree as follows:

> [s]hould any party hereto desire *to drill any well* on the Contract Area other than the well provided for in Article VI.A., or to *rework, deepen or plug back a dry hole* drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing or capable of producing in paying quantities, the party *desiring to drill, rework, deepen, or plug back such a well* shall give the other parties written notice of the proposed operation, *specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation.*"[7]

Under the plain meaning of the Shallow JOA, to be a subsequent operation under Article VI.B. of the Shallow JOA, the operation either must be (1) the drilling of a well on the Contract Area other than the well provided for in Article VI.A. of the Shallow JOA (hereinafter the "Drilling of a Well") or (2) the reworking, deepening or plugging back of a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing or capable of producing in pay-

---

**5.** The TEPCO Parties do not challenge on appeal the trial court's conclusion that the per-foot formula for calculating Wellbore Charges under Article XV.J. was replaced by an agreed-upon amount of $6 million as the total amount of the Wellbore Charges. Nor have the TEPCO Parties challenged the trial court's finding that, if the 600% cost-recoupment factor should be applied to the $6 mil-

lion in Wellbore Charges, the Payout Point has not been reached.

**6.** The TEPCO Parties and the Reef Parties all assert that the provisions of the agreements at issue in this case are unambiguous.

**7.** (emphasis added).

ing quantities (hereinafter the "Reworking of a Well").

Both in the trial court and on appeal, the TEPCO Parties have maintained that the Completion proposed by Reef was a subsequent operation under the Shallow JOA but that the Completion did not involve the drilling of a well.[8] We presume for the purposes of our analysis that the Completion did not involve the drilling of a well. If, as the TEPCO Parties assert, the Completion was a subsequent operation governed by Article VI.B. that did not involve the drilling of a well, then, under the unambiguous language of the Shallow JOA, the Completion must have been the Reworking of a Well. In the statement-of-facts section of their appellate brief, the TEPCO Parties effectively state that the Completion was the Reworking of a Well:

> To perform the [Completion], the Shallow JOA Art. VI.B.1 obligated Reef to propose it by furnishing to the other Shallow JOA parties the details of that proposed operation, including a description of the work to be performed and its estimated cost:

8. In their live petition, the TEPCO Parties alleged that the Completion was an operation subject to Article VI.B. of the Shallow JOA. At trial, the TEPCO Parties asserted that the Completion was a subsequent operation under Article VI.B. of the Shallow JOA, and the main fact witness that they called in their case-in-chief, Karen Mathews, testified that the Completion was a subsequent operation under the Shallow JOA. The trial court noted in its findings of fact and conclusions of law that the TEPCO Parties "insist" that a completion of the Well above 14,600 feet is a subsequent operation governed by Article VI.B. of the Shallow JOA. In their appellate briefing, the TEPCO Parties continue to assert that the Completion was an operation subject to Article VI.B. of the Shallow JOA.

9. (quoting Article VI.B. of the Shallow JOA, citations omitted, emphasis in original).

10. Article VI.B.2. of the Shallow JOA provides in pertinent part:

> "1. *Proposed Operations*: Should any party hereto desire ... to rework, deepen or plug back a dry hole ..: the party desiring ...' shall give the other parties written notice of the proposed operation, *specifying the work to be performed ... and the estimated cost of the operation.*"[9]

In light of the TEPCO Parties' assertions and their theory of recovery, we presume for the purposes of our analysis that the Completion was the Reworking of a Well covered by Article VI.B. of the Shallow JOA. It is undisputed that, in response to Reef's notice of the proposed Completion, the TEPCO Parties elected not to participate in the operation. Therefore, the TEPCO Parties were NonConsenting Parties, and their interests in the Well under the Shallow JOA were relinquished to the Consenting Parties until the Payout Point, calculated using the Formula under Article VI.B.2. of the Shallow JOA.[10]

The 600% cost-recoupment factor in the Formula applies to "that portion of *the*

> If *any well drilled, reworked, deepened or plugged back under the provisions of this Article* results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. *Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well* by Consenting Parties in accordance with the provisions of this Article, *each Non–Consenting Party shall be deemed to have relinquished to Consenting Parties*, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, *all of such Non–Consenting Party's interest in the well and share of production therefrom* until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold, (after deducing production taxes, excise taxes, royal-

*costs and expenses of* drilling, *reworking, deepening, plugging · back,* testing and completing ... and ... that portion of the cost of newly acquired equipment in the well ..., which would have been chargeable to such Non–Consenting Party if it had participated therein." [11] If, as we presume under the TEPCO Parties' theory of the case, the Completion was the Reworking of a Well, then, under the unambiguous language of Article VI.B.2., the Wellbore Charges constitute "*costs and expenses of ... reworking, deepening, plugging back,*

testing and completing ... which would have been chargeable to [the TEPCO Parties] if [they] had participated therein." [12] Therefore, the trial court did not err in concluding that, under the unambiguous language of the Shallow JOA and Deep JOA, the 600% cost-recoupment factor should be applied to the $6.million in Wellbore Charges in calculating the Payout Point. [13]

The Reef Parties asserted, and the trial court concluded, that the Wellbore

---

ty, overriding royalty and other interests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(a) 200% of each such Non–Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non–Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non–Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non–Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non–Consenting· Party had it participated in the well from the beginning of the operation; and

(b) 600% of that portion of *the costs and expenses of drilling, reworking, deepening, plugging back, testing and completing,* after deducting any cash contributions received under Article VIII.C. and 600% of that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non–Consenting Party if it had participated therein.

...

If and when the Consenting Parties recover from a Non–Consenting Party's relinquished interest the amounts provided for above, the relinquished interest of such Non–Consenting Party shall automatically revert to it, and, from and after such rever-

sion, such Non–Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non–Consenting Party would have been entitled to had it participated in *the drilling, reworking, deepening or plugging back of said well.* (emphasis added).

11. (emphasis added).

12. (emphasis added). Evidence that any of the Reef Parties characterized the Wellbore Charges as "drillings costs," "financial reimbursement," or "acquisition cost" does not preclude the Wellbore Charges from being costs and expenses of the Reworking of a Well in light of the TEPCO Parties' theory of the case under which the Completion was the Reworking of a Well.

13. In the trial court, the TEPCO Parties also alleged claims for breach of the Shallow JOA based on complaints that (1) if the Wellbore Charges were includable in the Formula, it would be in the part involving the 100% cost-recoupment factor; (2) the total amount of the Wellbore Charges was less than $6 million; (3) in calculating the Payout Point, the Reef Parties allocated a disproportionate amount of the Wellbore Charges to the TEPCO Parties; and (4) in calculating the Payout Point, the Reef Parties improperly included *seismic costs and used incorrect net-revenue interests.* The TEPCO Parties have not assigned error on appeal as to these complaints. In any event, the Wellbore Charges could not be "cost of any newly acquired surface equipment beyond the wellhead connections" subject to the 200% cost-recoupment factor or

Charges were subject to the 600% cost-recoupment factor because they were "costs and expenses of drilling" under the Formula. Even presuming, without deciding, that the trial court erred in reaching this conclusion, for the foregoing reasons, the trial court still was correct in concluding that the 600% cost-recoupment factor should be applied to the $6 million in Wellbore Charges in calculating the Payout Point, and the absence of any drilling or drilling costs in the Completion would not mean that the trial court erred in rendering a take-nothing judgment as to the TEPCO Parties' claims.[14] *See Busch v. Hudson & Keyse, LLC*, 312 S.W.3d 294, 299 (Tex.App.–Houston [14th Dist.] 2010, no pet.) (stating that even if the trial court makes an erroneous conclusion of law, the court of appeals will not reverse if the trial court rendered the proper judgment); *Nelkin v. Panzer*, 833 S.W.2d 267, 268 (Tex.App.–Houston [1st Dist.] 1992, writ dism'd w.o.j.) (noting that the trial court's judgment will be affirmed if it is correct under any legal theory supported by the evidence).

Because we may uphold the conclusion that the 600% cost-recoupment factor should be applied to the $6 million in Wellbore Charges in calculating the Payout Point based on the "Reworking of a Well" language in the Shallow JOA and without relying on Article XV.J. of the Deep JOA, the TEPCO Parties' arguments challenging the characterization of the Wellbore Charges as drilling costs or challenging reliance on language in the Deep JOA do not show that the trial court erred in rendering judgment that the TEPCO Parties take nothing.[15]

The TEPCO Parties argue that the Wellbore Charges may not be included in calculating the Payout Point under the Formula because only costs that are proposed in Reef's written notice of the proposed operation may be included, and the TEPCO Parties assert that the written notice did not include these charges as a cost. The TEPCO Parties assert that Reef's proposal did not refer to the Wellbore Charges. This assertion is incorrect. In the proposal letter, Reef stated that a completion prognosis and estimated AFE were attached and that a breakdown of each party's share of the AFE costs was listed at the end of the proposal. Reef then says, "In addition to the AFE costs, [EP Energy] is seeking a $6,000,000.00 reimbursement fee to take over the wellbore, which would be paid by each party's proportionate working interest in the shallow depths accordingly."

The trial court made fact findings that (1) Mathews, testifying on behalf of the TEPCO Parties, said that Reef's February 28, 2007, proposal was notice to the Shallow JOA working-interest owners that if

---

"cost of operation of the well commencing with first production" subject to the 100% cost-recoupment factor.

14. On appeal, the TEPCO Parties challenge the trial court's judgment that they take nothing and its award of attorney's fees to the Reef Parties; however, the TEPCO Parties do not present any argument that the trial court erred in rendering any of the declarations in its judgment. Indeed, in their opening brief, the TEPCO Parties assert that the trial court did not grant any declaratory relief in its judgment.

15. In this regard, the TEPCO Parties make the following arguments on appeal: (1) the trial court's reliance on language from the Deep JOA would mean that the Deep JOA replaces or supersedes the Shallow JOA, contrary to Article XV.V. of the Deep JOA; (2) the trial court erred in reading the Shallow JOA and the Deep JOA together, thus making provisions of each agreement meaningless; and (3) the meaning of the language in the Formula in the Shallow JOA should be construed without reliance on terms in the Deep JOA.

they participated in the proposed completion, they would be charged their proportionate share of the $6 million sought by EP Energy in addition to the estimated completion costs listed on the AFE; (2) the TEPCO Parties acknowledged that, had they participated in the proposed Completion, they would have had to pay their proportionate share of the Wellbore Charges; (3) John Aubrey, the owner of TEPCO, Kiawah Resources, and Meritage Energy, also acknowledged in an email that in the February 28, 2007, letter Reef proposed "paying $6,000,000 plus AFE costs"; and (4) the TEPCO Parties knew that Reef's proposal included an Article XV.J. drilling-cost-reimbursement component. The TEPCO Parties have not challenged these findings on appeal. We conclude that the TEPCO Parties have not shown that the trial court erred in failing to determine that the Wellbore Charges may not be included in calculating the Payout Point under the Formula based on the information contained in Reef's written notice of the proposed Completion.[16]

The TEPCO Parties have not shown that the trial court erred in determining that the 600% cost-recoupment factor should be applied to the Wellbore Charges in calculating the Payout Point for the purposes of determining the merits of the TEPCO Parties' claims. Accordingly, we overrule the TEPCO Parties' first issue.[17]

*Request for Attorney's Fees under Chapter 38 of the Texas Civil Practice and Remedies Code*

In their fifth issue, the TEPCO Parties assert that they are entitled to attorney's fees under Chapter 38 of the Texas Civil Practice and Remedies Code and that this court should remand for the trial court to render judgment awarding them reasonable and necessary attorney's fees. Because we have overruled the first issue and are not reversing and remanding any of the TEPCO Parties' claims to the trial court, there is no basis for remanding this request for attorney's fees. Therefore, we overrule the fifth issue.

**B. Did the trial court err in awarding the Reef Parties attorney's fees under the Declaratory Judgments Act?**

■ In their fourth issue, the TEPCO Parties assert that the trial court erred in awarding the Reef Parties attorney's fees under the Declaratory Judgments Act because the Reef Parties' counterclaims for declaratory relief duplicate the issues raised by the Reef Parties' defenses to the TEPCO Parties' claims.[18]

The TEPCO Parties asserted claims for breach of the Shallow JOA, conversion, unjust enrichment/money had and received, and quantum meruit. There is no

---

16. The TEPCO Parties also argue that, in conclusion of law 24, the trial court improperly relied upon its views of the parties' expectations rather than the unambiguous language of the contracts. Presuming for the sake of argument that the trial court improperly relied upon its view of the parties' expectations in making this conclusion of law, this error would not require reversal of the take-nothing judgment against the TEPCO Parties. *See Busch,* 312 S.W.3d at 299 (stating that even if the trial court makes an erroneous conclusion of law, the court of appeals will not reverse if the trial court rendered the proper judgment).

17. In their second issue, the TEPCO Parties assert that the trial court erred in concluding that they were not entitled to recover against certain of the Reef Parties because of a lack of privity of contract. In their third issue, the TEPCO Parties assert that the trial court erred in concluding that the statute of limitations barred their claims for breach of the Shallow JOA, conversion, and unjust enrichment/money had and received. Because we overrule the first issue, we need not and do not address the second and third issues.

18. The TEPCO Parties preserved error in the trial court regarding this complaint.

applicable contract or statute that would allow the Reef Parties to recover their attorney's fees for successfully defending against these claims. The TEPCO Parties did not assert any claim for declaratory relief.

The Reef Parties counterclaimed seeking declaratory relief. The trial court made declarations in its final judgment regarding (1) the agreement to replace the per-foot formula for calculating Wellbore Charges under Article XV.J. with an agreed-upon amount of $6 million as the total amount of these charges, (2) the lack of privity of contract under the Shallow JOA between the TEPCO Parties and some of the Reef Parties, (3) the absence of any duty under the the Shallow JOA requiring any non-operating working interest owner or owner of non-consent interests to calculate the Payout Point, maintain a joint account of income and expenses, itemize costs and liabilities, or otherwise account to the other non-operators, (4) the construction of the Shallow JOA and the Deep JOA and the trial court's determination that the Wellbore Charges were drilling costs and were subject to the 600% cost-recoupment factor in the Formula; and (5) the determination that the Payout Point has not occurred and will not occur.[19]

The question under the fourth issue is not whether the Reef Parties were entitled to the above-mentioned declaratory relief The TEPCO Parties have not raised that issue, and they need not do so to argue that the Reef Parties may not recover attorney's fees under the Declaratory Judgments Act. See MBM Fin. Corp. v. Woodlands Operating Co., L.P., 292 S.W.3d 660, 667 (Tex.2009). Even if the Reef Parties were entitled to the above-mentioned declaratory relief, that would not necessarily mean that they are able to recover attorney's fees.[20] Id. at 669.

### Claim for Attorney's Fees Under the Declaratory Judgment Act

Texas follows the "American Rule" prohibiting fee awards unless specifically provided by contract or statute. Id. But, the Declaratory Judgments Act allows fee awards to either party in all cases. Id. If repleading a claim as a request for declaratory judgment could justify a fee award, attorney's fees would be available for all parties in all cases. Id. That would repeal not only the American Rule but also the limits imposed on fee awards in other statutes. Id. So, the rule is that a party cannot use the Act as a vehicle to get

19. The trial court purported to make declarations in the Amended Findings of Fact and Conclusions of Law that it signed after rendition of its Amended Final Judgment. Presuming for the sake of argument that such declarations are valid, these declarations are substantially similar to the declarations contained in the trial court's final judgment.

20. The Reef Parties rely upon Indian Beach Property Owners' Ass'n v. Linden. See 222 S.W.3d 682, 701–02 (Tex. App.–Houston [1st Dist.] 2007, no pet.). In that case, the court of appeals rejected a challenge to the declaratory relief granted by the trial court, concluding that the matters on which the trial court granted declaratory relief were proper subjects for a declaratory judgment. See id. La-

ter in its opinion, the court addressed a challenge to the trial court's award of attorney's fees under the Declaratory Judgments Act. See id. at 706–07. The court concluded that, because it had rejected all challenges to the propriety of granting the declaratory judgment, this judgment provided a proper basis for awarding fees under the Declaratory Judgments Act. See id. The Linden case preceded MBM Fin. Corp. v. Woodlands Operating Co., L.P., 292 S.W.3d 660, 667 (Tex.2009), and therefore does not apply the high court's analysis from that case in determining whether the trial court properly awarded fees under the Declaratory Judgments Act. See id. The Linden case is not on point.

otherwise impermissible attorney's fees. *Id.*

When a claim for declaratory relief is merely tacked onto a standard suit based on a matured breach of contract, allowing fees under Chapter 37 would frustrate the limits Chapter 38 imposes on such fee recoveries. *Id.* at 670. The TEPCO Parties did not seek declaratory relief, and the declarations the Reef Parties obtained address issues raised by the TEPCO Parties' claims and the Reef Parties' defenses against those claims. The Reef Parties assert that part of one the declarations did not duplicate issues already before the court. In that declaration, the trial court declared that the Payout Point has not occurred, and "will not occur based on the reasonable minimal production from the [Well] and Reef's stated intention to plug and abandon the Well in the Summer of 2014." The Reef Parties assert that this declaration went beyond the issue of whether the Payout Point had been reached and addressed whether the Payout Point would be reached, which, according to the Reef Parties, impacts oil and gas obligations, including who is responsible for plugging and abandoning the Well. But, the TEPCO Parties' claims raise the issue of whether the Payout Point has been reached, and the parties' rights and responsibilities are not affected by the trial court's speculative prediction as to whether the Payout Point will be reached in the future, though these rights and responsibilities may be affected by whether the Payout Point, in fact, is reached in the future.[21]

The trial court's declarations duplicated issues raised by the TEPCO Parties' claims and the Reef Parties' defenses against those claims.[22] In this context, the Reef Parties are not entitled to recover attorney's fees under the Declaratory Judgments Act. *See id.* at 670–71; *Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 624–25 (Tex.2011); *King Ranch, Inc. v. Garza*, No. 04–13–00606–CV, 2014 WL 5020037, at *4–5 (Tex.App.–San Antonio Oct. 8, 2014, pet. denied) (mem. op.); *Gonzalez Financial Holdings, Inc. v. Moore*, No. 14–09–00503–CV, 2010 WL 4514402, at *4 (Tex.App.–Houston [14th Dist.] Nov. 9, 2010, no pet.) (mem. op.); *City of Houston v. Texan Land and Cattle Co.*, 138 S.W.3d 382, 392 (Tex.App.–Houston [14th Dist.] 2004, no pet.). Accordingly, we sustain the TEPCO Parties' fourth issue.

## III. CONCLUSION

The TEPCO Parties have not shown that the trial court erred in determining that the 600% cost-recoupment factor should be applied to the Wellbore Charges in calculating the Payout Point for the purposes of adjudicating the TEPCO Parties' claims. The trial court, however, erred in awarding attorney's fees based on declaratory relief that duplicated issues already before the court, as to which the Reef Parties cannot recover attorney's fees. Therefore, we modify the trial court's judgment to delete all attorney's-

---

**21.** In support of their fourth issue, the TEPCO Parties assert that the Deep JOA has terminated. The trial court did not make a finding to that effect, and the trial evidence does not conclusively prove this proposition. In adjudicating the issues in this appeal, we do not rely upon the proposition that the Deep JOA has terminated.

**22.** In a conclusion of law, the trial court stated that the Reef Parties' claims for declaratory relief present issues beyond those raised by the TEPCO Parties in their claims, but the trial court did not explain or state which issues regarding declaratory relief went beyond those already before the court based on the TEPCO Parties' claims and the Reef Parties' defenses against those claims.

fee awards, and affirm the judgment as modified.